# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PETRA BUSCHMEIER, ) | |
| ) | |
| Plaintiff / Judgment Creditor, ) | |
| ) | |
| v. ) | Misc. No. 02: 03mc00506 |
| ) | |
| G&G INVESTMENTS, INC., ) | |
| ) | |
| Defendant / Judgment Debtor. ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

November 19, 2007

Presently before the Court is the JOINT MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL FOR CONFLICT OF INTEREST INVOLVING A FORMER CLIENT filed by Executive Warehouse, Inc., Today's Express, Inc., Ghaznavi Investments, Inc., Ghaznavi Enterprises, Inc., and John J. Ghaznavi Foundation (the "Subpoenaed Entities") and John J. Ghaznavi ("Ghaznavi") (collectively referred to as "the Movants") (*Document No. 160*) and the RESPONSE IN OPPOSITION filed by Plaintiff / Judgment Creditor Petra Buschmeier (Document No. 162).

On September 20, 2007, the Court heard testimony and argument on the joint motion. All interested participants were represented by counsel who presented and argued the issues skillfully and effectively. At the hearing, the interests of the law firm of Reed Smith LLP ("Reed Smith") on behalf of Petra Buschmeier were represented by John C. Unkovic, Esquire. The Subpoenaed Entities were represented by Kathleen A. Gallagher, Esquire of Eckert Seamans Cherin & Mellot, LLC ("Eckert Seamans"). John Ghaznavi was represented by William F. Ward, Esquire, and Hugh F. McGough, Esquire, of Ward McGough, LLC. One

witness James W. Ummer, Esquire ("Ummer") was presented on behalf of the Movants. Reed Smith submitted Affidavits of Arnd N. von Waldow, Esquire, and Timothy J. Cornetti, Esquire, which were essentially unrebutted.

At the conclusion of the hearing, the attorneys for the parties agreed that no additional briefing was necessary and that the record was sufficiently complete for the Court to rule upon the motion.

For the reasons hereinafter set forth, the Motion to Disqualify will be denied.

**Procedural History**

The movants, parties, counsel, and the Court are familiar with the extensive background facts of this case and, therefore, the Court will not the recite the facts again. However, the following is a brief recitation of the procedural facts salient to the issues presently before the Court.

Petra Buschmeier ("Buschmeier") commenced this action against G&G Investments, Inc., in September 2003 with the filing of a Writ of Execution. Ghaznavi was not a formal party to the execution proceedings; however, throughout the course of this litigation, he has, through counsel, made numerous filings and other requests of the Court.

In September 2003, Buschmeier first requested information concerning the assets of the "owners, parents, subsidiaries and/or affiliates" of G&G Investments, Inc. It is alleged that G&G has continuously failed, neglected and/or refused to provide such requested information in full and complete fashion; in fact, the failure of G&G and Ghaznavi, as corporate officer of G&G, is the subject of the pending contempt proceedings.

In late 2003, Buschmeier also issued subpoenas upon the Subpoenaed Entities. Those subpoenas sought, *inter alia,* documents that "list, reflect, refer or relate to any of Your and/or Your partners' (limited and/or general) assets and/or liabilities, from January 1, 1988 to the present." The subpoenas also requested documentation which reflected transactions with, *inter alia*, Ghaznavi himself and a number of Ghaznavi-related entities. The Subpoenaed Entities, through counsel, objected to the scope of the subpoenas and argued that Buschmeier was not entitled to discover their assets and financial information insofar as they were third-parties to the proceeding.

On November 1, 2004, Buschmeier sought, *inter alia,* the initiation of contempt proceedings against Ghaznavi and Patrick T. Connelly ("Connelly"), personally, for their respective roles in allegedly (i) permitting the destruction of evidence and (ii) authoring a letter to Hillsboro Glass retirees which misrepresented the current ownership of that entity. *See* Document 60.

The Court subsequently ordered that "John J. Ghaznavi and Patrick T. Connelly shall show written cause under oath why they should not be held personally liable for civil contempt" for the alleged destruction of documents and also ruled that Ghaznavi and Connelly "shall show written cause under oath why they should not be held personally liable for civil contempt for the above referenced communications and actions regarding the retirees of Hillsboro Glass Co. and Glenshaw Glass." That contempt hearing was scheduled on September 4, 2007.

Thirteen (13) days before the contempt hearing was to commence, Ghaznavi and the Subpoenaed Entities filed the instant motion in which they request that the Court disqualify Reed Smith from its representation of Buschmeier in this proceeding. Ghaznavi and the

Subpoenaed Entities argue that the representation by Reed Smith, which began in January 2006, violates Rules 1.9 and 1.10(c) of the Pennsylvania Rules of Professional Conduct due to the fact that Ummer provided estate planning counseling to Ghaznavi during the time period during which Ummer was employed by Reed Smith, specifically from January 2000 to May 2003.

**Testimony of James W. Ummer, Esquire**

In 1972, Ummer began the practice of law with the law firm of Buchanan Ingersoll, in Pittsburgh, Pennsylvania. His specialty was, and continues to be, estate planning, especially for "entrepreneurial-type people" who own their own business.

Ummer testified that he first met Ghaznavi in the late 1970's. Early on, Ummer wrote wills for Ghaznavi and his wife, and eventually set up trusts for the Ghaznavi family and related entities. In 1984, Ummer created for Ghaznavi a "Consolidated Trust a/k/a The Ghaznavi Family Trust," which was a separate legal entity that was designed to expand with the "Ghaznavi Empire." In creating the Ghaznavi Family Trust, Ummer worked with David Gutowski and Patrick Connelly, both of whom were employees of Ghaznavi, and C. Kent May, Esquire, the corporate counsel for many of the corporate entities that were created on behalf of Ghaznavi and his business interests.

Ummer also testified that the following attorneys at Buchanan Ingersoll worked on or assisted him on Ghaznavi matters: Gregory A. Pearson, Robert A. King (business litigation), R. Douglas DeNardo (estate planning); John Schmerling (estate planning); Leonard J. Marsico, and Fran Maroka (tax matters).

In January 1991, Ummer left Buchanan Ingersoll and became a solo practitioner. However, after Ummer left Buchanan Ingersoll, he continued to work with R. Douglas DeNardo, Esquire, and Robert A. King, Esquire, and would on occasion discuss Ghaznavi matters.

On December 15, 1992, Ummer joined the law firm of Babst, Calland, Clements, and Zomnir, P.C. ("Babst Calland").[1] In January 2000, Ummer, along with a group of fifteen (15) to seventeen (17) attorneys, left Babst Calland and joined Reed Smith. R. Douglas DeNardo, Esquire, and Robert A. King, Esquire, were among the attorneys who left Babst Calland and transferred to Reed Smith. Ummer took a number of clients with him to Reed Smith, including Ghaznavi.

When Ummer joined Reed Smith, he opened two files for new business: John Ghaznavi and John Ghaznavi - Estate Planning. Ummer testified that he had no recollection of opening a separate file for the Ghaznavi Family Trust. Ummer further testified that he did not open a new business memorandum for any of the Subpoenaed Entities as C. Kent May, Esquire, with Eckert Seamans continued to represent those entities.

While at Reed Smith, Ummer's main assignment for the Ghaznavi Family Trust was a matter which involved the proposal that the Glenshaw Glass Pension Fund be taken over by the Pension Plan Guaranty Corporation ("PPGC'), a federal insurance program that exists to insure the integrity of existing pension plans. The role of Ghaznavi and the Ghaznavi Family Trust and the other related business entities came under scrutiny by the PPGC. Ummer testified

---

[1] In 1990, Robert A. King left Buchanan Ingersoll and went to the law firm of Babst Calland; sometime in 1994/1995, R. Douglas DeNardo left Buchanan Ingersoll and also went to Babst Calland.

that this investigation was very significant for Ghaznavi and his various businesses. The Eckert Seamans law firm took the lead on the significant ERISA aspect of the PPGC investigation. Ummer confirmed that he was the only Reed Smith attorney involved in the PPGC investigation; no one from the ERISA group at Reed Smith was involved in the PPGC investigation or billed any time for work on the PPGC investigation.

Ummer testified that all payments for legal fees made by Ghaznavi for services rendered by Ummer for the time period during which Ummer was with Reed Smith were made to directly to the firm. Also, Ummer utilized Reed Smith paralegals and the word processing center for all of his professional representation on Ghaznavi matters.

Ummer also testified that he received faxes from Patrick Connelly via the Reed Smith fax machine, as he did not have his own personal fax machine. In particular, he identified a September 4, 2001 fax he received from Connelly, which identified the "family tree" of the Ghaznavi Business Empire, which was sent to him in preparation for his response to the PPGC. Ummer had been asked by the PPGC to summarize the history and provisions of the Ghaznavi Family Trust so that the PPGC could understand the organizational structure of the Ghaznavi business entities.

Ummer left Reed Smith in May 2003 and joined the law firm of Rothman Gordan, where he continues to practice to date. Ummer testified that the last date that he billed any time to Ghaznavi while he was a Reed Smith attorney was January 7, 2003. Ummer does not think that Bob King billed any time to Ghaznavi because King is a litigator, not an estate attorney, and King did not assist in preparation of any estate documents.

Ummer left Reed Smith on favorable terms and still maintains cordial relationships with several members of the firm. Ummer testified that when he left Reed Smith, he took with him to Rothman Gordan all of his personal professional files, including the physical document files for Ghaznavi and the Ghaznavi Family Trust..

Since his departure, he contacted Bob King once to inquire of King if he would be interested in representing Ghaznavi on a litigation matter, but King declined. Ummer verified that he has not spoken with King regarding any Ghaznavi estate planning issues since he left Reed Smith.

Ummer testified that the Affidavits submitted by Arnd N. von Waldow, Esquire, and Timothy J. Cornetti, Esquire, were accurate to the best of his knowledge.

**Uncontroverted Affidavits of Arnd N. von Waldow, Esquire
and Timothy J. Cornetti, Esquire**

A. <u>Affidavit of Arnd N. von Waldow, Esquire ("von Waldow")</u>

von Waldow has been employed continuously with the law firm of Reed Smith LLP since 1999. In his affidavit, von Waldow avers, *inter alia,* the following:

"2.     In January of 2006, Reed Smith was contacted by Petra Bushmeier regarding the potential representation of her in the within execution of judgment matter.

3.     Prior to undertaking representation of Petra Buschmeier, [he] was made aware of a Reed Smith conflicts check which identified Attorney James Ummer, formerly of Reed Smith, had previously represented Mr. Ghaznavi in some capacity, and that representation ended in 2003.

4. [He] had no involvement in Mr. Ummer's prior representation of Mr. Ghaznavi and was unaware of any such representation prior to the conflicts check which was performed in January of 2006.

. . .

6. [He has] never spoken to Mr. Ummer regarding any matter, including his representation of Mr. Ghaznavi. [he] did not know Mr. Ummer when he was at Reed Smith and [has] never had contact with him.

7. [He has] never reviewed or had access to any information or documentation relating to Mr. Ummer's representation of Mr. Ghaznavi.

8. At no time have I had access to, or received any information or documentation related to Mr. Ummer's prior representation of Mr. Ghaznavi and could not (and did not) utilize any such information or documentation as part of Reed Smith's representation of Petra Buschmeier."

*See* Response in Opposition, Exhibit A.

B. <u>Affidavit of Timothy J. Cornetti, Esquire ("Cornetti")</u>

Cornetti has been employed continuously with the law firm of Reed Smith LLP since 2000. In his affidavit, Cornetti avers, *inter alia,* the following:

"2. In January of 2006, Reed Smith was contacted by Petra Bushmeier regarding the potential representation of her in the within execution of judgment matter.

3. Prior to undertaking representation of Petra Buschmeier, [he] directed that a conflicts check be performed to determine whether or not Reed Smith had previously

represented a variety of persons and entities adverse to Mrs. Buschmeier including G&G Investments, Inc., the Judgment Debtor, and John J. Ghaznavi.

4. As a result of the conflicts check, [he] learned that James Ummer, formerly of Reed Smith, had previously represented Mr. Ghaznavi in some capacity, and that representation ended in 2003. Upon receipt of the conflicts information in January 2006, [he] placed the Office of General Counsel of Reed Smith on notice of that fact.

5. As a result of [his] inquiry, [he] was informed that there were no physical files present at Reed Smith relating to Mr. Ummer's prior representation of Mr. Ghaznavi and that any and all electronic documents present on Reed Smith's computer system had been sealed off from access to all lawyers at Reed Smith.

6. [He] had no involvement in Mr. Ummer's prior representation of Mr. Ghaznavi and was unaware of any such representation prior to the conflicts check which was performed in January of 2006.

. . .

8. [He] has never spoke to Mr. Ummer regarding any matter, including his representation of Mr. Ghaznavi. [He] did not know Mr. Ummer when he was at Reed Smith and [has] never had contact with him.

9. [He has] never reviewed or had access to any information or documentation relating to Mr. Ummer's representation of Mr. Ghaznavi.

10. At no time [has he] had access to, or received any information or documentation related to Mr. Ummer's prior representation of Mr. Ghaznavi and could not (and

did not) utilize any such information or documentation as part of Reed Smith's representation of Petra Buschmeier."

*See* Response in Opposition, Exhibit B.

**Legal Standard**

The United States District Court for the Western District of Pennsylvania has explicitly adopted the Pennsylvania Rules of Professional Conduct to govern the ethical standards for attorneys practicing within its district. *See* W.D. Local Rule 83.3.1 "A district court derives the power to disqualify an attorney from its inherent authority to supervise the professional conduct of the attorneys appearing before it." *United States v. Miller*, 624 F.2d 1198, 1201 (3rd Cir. 1980). Attorney disqualification is generally the result of a court finding that a disciplinary rule prohibits an attorney's appearance. *See id.* Even if a court finds that counsel violated the Pennsylvania Rules of Professional Conduct, disqualification is not mandatory. See *Jordan v. The Philadelphia Housing Auth.*, 337 F. Supp. 666, 671-72 (E.D. Pa. 2004).

To disqualify opposing counsel, the moving party must clearly show that continued representation by opposing counsel would be impermissible. *See Cohen v. Oasin*, 844 F. Supp. 1065, 1067 (E.D. Pa.1994). Disqualification is a harsh measure and is generally disfavored by the court. See *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F. Supp. 1200, 1203 (E.D. Pa.1992). Moreover, the court has an obligation to prevent opposing parties from using motions to disqualify for tactical purposes. *See id.* "In determining whether disqualification is appropriate, the Court must also consider countervailing policies, such as permitting a litigant

10

to retain his chosen counsel and enabling attorneys to practice without excessive restrictions." *Jordan,* 337 F. Supp. at 672 . The court should only grant a motion to disqualify when it determines that disqualification is an appropriate means of enforcing the applicable disciplinary rule. *See Miller*, 624 F.2d at 1201. As such, vague and unsupported allegations are not sufficient to meet this standard.

## Discussion

In the present case, the Movants contend that Reed Smith has violated Rules 1.9(c) and 1.10(c) of the Pennsylvania Rules of Professional Conduct and, therefore, should be disqualified from further representing Buschmeier. Not surprisingly, Reed Smith vigorously opposes the motion and contends that the motion was filed as a tactical maneuver to delay the upcoming scheduled Contempt Hearing.

Rule 1.9 provides, in pertinent part, as follows:

(c) A <u>lawyer who has formerly represented a client in a matter</u> or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Rule 1.9 (emphasis added) . The underscored language makes clear that Rule 1.9 governs the conduct of an <u>attorney</u> who has formerly represented a client in a matter. It is unclear whether the Movants contend that Rule 1.9 provides an independent basis for disqualifying Reed Smith

11

as counsel for Buschmeier. However, to the extent that they do, the Court finds and rules that Rule 1.9 does not apply when an attorney has terminated an association with a law firm and that firm seeks to undertake a representation adverse to a client who had been represented by the firm's former attorney. *See Unisys, Corp. v. Amperif Corp.*, No. 92-1966, 1992 WL 210243, at *2 (E.D. Pa. Aug. 20, 1992).

Rule 1.10(c) is the appropriate rule for determining whether Reed Smith should be disqualified in this litigation. Rule 1.10(c) provides, in pertinent part, as follows:

> (c) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:
>
> (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
>
> (2) any lawyer remaining in the firm has information protected by Rule 1.6 and 1.9(c) that is material to the matter.

Explanatory Comment [5] to Rule 1.10 instructs as follows:

> Rule 1.10(c) operates to permit a law firm, under certain circumstances, to represent a person with interests directly adverse to those of a client represented by a lawyer who formerly was associated with the firm. . . . [T]he firm may not represent the person where the matter is the same or substantially related to that in which the formerly associated lawyer represented the client and any other lawyer currently in the firm has material information protected by Rules 1.6 and 1.9(c).

By its express terms, Rule 1.10 governs whether a firm is precluded from undertaking a representation adverse to a client who had been represented by one or more of its attorneys after the attorney has left the firm. "The rule assesses whether the lawyer who has left a firm 'has taken with him all the 'taint' that would disable the firm from a subsequent representation." *Unisys*, 1992 WL 210243, at *3.

The critical inquiry under Rule 1.10 is whether attorneys remaining at the law firm have confidential information material to the matter which is then used as part of the subsequent representation.

a. *Substantial Relationship*

"[T]here is a substantial relationship between the two representations if facts pertinent to the problems for which the original legal services were sought are relevant to subsequent litigation." *United States Football League v. National Football League*, 605 F. Supp. 1448, 1459 (S.D.N.Y. 1985).

In order to determine whether a "substantial relationship" is present, the Court must "undertake a 'painstaking analysis of the facts'" and answer the following three (3) questions: (i) "what is the nature and scope of the prior representation at issue"; (ii) "[w]hat is the nature of the present lawsuit [filed against ] the former client"; and (iii) "[i]n the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action" and, "[i]n particular, could any such confidences be detrimental to the former client in the current litigation?*" Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*, 652 F. Supp. 1281, 1283 (D. Del. 1987). The moving party bears the burden of establishing the existence of a "substantial relationship," however, any doubts about whether disqualification is appropriate should be resolved in favor of the movant to ensure protection of client confidences. *Underwriters v. Nalibotsky,* 594 F. Supp. 1199, 1207 (E.D. Pa. 1984).

The Court finds and rules that the matters in which Attorney Ummer represented Ghaznavi while at Reed Smith are not "substantially related" to the instant collection effort litigation. Attorney Ummer provided legal advice on discrete legal issues, such as estate

planning and representation of the Ghaznavi Family Trust in the PPGC proceedings. Accordingly, the three cases that the Movants relied upon during oral argument are not persuasive to the Court's determination. In each case, the challenged law firm was attempting to represent a party with adverse interests to its former client <u>and</u> the current litigation was either "the same or substantially related" to the previous litigation. *See In re Corn Derivatives Antitrust Lit.*, 748 F.2d 157 (3d Cir. 1984) (holding that law firm breached duty of loyalty when it initially represented two plaintiffs in same litigation; then withdrew as counsel for one plaintiff, but continued to represent second plaintiff which had interest adverse to first client); *Estate of Pew*, 655 A.2d 521, 546 (Pa. Super. 1994) (finding that law firm properly withdrew its representation of executors and co-trustees when such representation would have been adverse to a former client in a matter "substantially related" to that which the attorney previously had served the client); *Elan Transdermal Ltd v. Cygnus Therapeutic Systems,* 809 F. Supp. 1383 (N.D. Cal. 1992) (plaintiff's law firm disqualified because it had previously given legal advice to the defendant during development of same patent which was the subject of the instant litigation).

b. *Confidential Information*

The Court also finds and rules that the Movants have not satisfied the second prong of Rule 1.10(c)(2), that is, that an attorney remaining at the firm possesses confidential information from the prior representation which is material to the current litigation. To establish the second prong, the Movants must demonstrate that (i) Ghaznavi imparted

confidential information to a Reed Smith attorney; (ii) the information is material to this collection effort litigation; and (iii) that attorney is currently at Reed Smith.

The Movants focus their argument on the possibility that confidential information was disclosed. Specifically, Movants assert in conclusory fashion that "Attorney Ummer, and thus, Reed Smith, acquired confidential information. . . ." Mot., at ¶ 26. This assertion of imputed knowledge upon Reed Smith is simply not sufficient under Rule 1.10(c).

The unrebutted affidavits of Attorneys von Waldow and Cornetti establish that these attorneys, who are currently at Reed Smith, have had no access, or received any information or documentation, confidential or not, related to Attorney Ummer's prior representation of Ghaznavi and could not (and did not) utilize any such information or documentation as part of Reed Smith's representation of Buschmeier.

## Conclusion

The Court will deny the instant motion to disqualify Reed Smith as Buschmeier's counsel because the Movants have failed to demonstrate clearly that the representation of Buschmeier by the Reed Smith law firm is impermissible under the instant circumstances. The Court finds and rules that the representation by Reed Smith of Buschmeier in this collection effort litigation is not substantially related to Ummer's previous work for Ghaznavi while affiliated with the firm. Further, no current Reed Smith attorney possesses confidential information from Ghaznavi which is material to this litigation.

An appropriate Order follows.

                McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PETRA BUSCHMEIER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Miscellaneous No. 03-506 |
| | ) |
| G&G INVESTMENTS, INC., | ) |
| | ) |
| Defendant | ) |

## ORDER OF COURT

**AND NOW**, this 19th day of November, 2007, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that the Joint Motion to Disqualify Plaintiff's Counsel For Conflict of Interest Involving a Former Client is **DENIED**.

The evidentiary hearing on the Complaint in Contempt and Answer previously scheduled on September 4, 2007 is rescheduled on **Tuesday, December 18, 2007** at 9:00 A.M. in Courtroom 6C.

BY THE COURT:

/s/ Terrence F. McVerry
United States District Court Judge

cc:    Arnd N. von Waldow, Esquire
       Reed Smith
       Email: avonwaldow@reedsmith.com

       Timothy J. Cornetti, Esquire
       Reed Smith
       Email: tcornetti@reedsmith.com

       John B. Cromer, Esquire
       Burns, White & Hickton
       Email: jbcromer@bwhllc.com

       C. Kent May, Esquire
       Eckert, Seamans, Cherin & Mellott
       600 Grant Street
       44th Floor
       Pittsburgh, PA 15219

       John D. Waclawski, Jr., Esquire
       Dickie, McCamey & Chilcote
       Email: jwaclawski@dmclaw.com

       William F. Ward, Esquire
       Ward & McGough
       Email: wfw@wardmcgough.com

       Hugh F. McGough, Esquire
       Ward McGough, LLC
       Email: hfm@wardmcgough.com